IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

JONATHAN CURTIS YOUNGBEAR,

      Defendant.

No. CR14-0046

REPORT AND RECOMMENDATION

---

**TABLE OF CONTENTS**

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *911 Call* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Officers Respond to the Scene* . . . . . . . . . . . . . . . . . . 3
     C.    *Officers Enter the House* . . . . . . . . . . . . . . . . . . . 4
     D.    *Search Warrant* . . . . . . . . . . . . . . . . . . . . . . . . . 4
     E.    *Defendant Transported to Tama County Sheriff's Office* . . . . . . . . 5
     F.    *Defendant Interviewed* . . . . . . . . . . . . . . . . . . . . . 7
     G.    *Blood Testing* . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.   *ISSUES PRESENTED* . . . . . . . . . . . . . . . . . . . . . . . . 15

V.    *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     A.    *Did the Warrantless Entry Violate the Constitution?* . . . . . . . . . . . 15
     B.    *Is the Search Warrant Invalid?* . . . . . . . . . . . . . . . . . . 21
     C.    *Did Defendant Validly Waive His Miranda Rights?* . . . . . . . . . 28
         1.    *Voluntary* . . . . . . . . . . . . . . . . . . . . . . . . . 29
         2.    *Knowing and Intelligent* . . . . . . . . . . . . . . . . . . 32
     D.    *Was Defendant's Statement to Investigators Voluntary?* . . . . . . . . 34
     E.    *Did Defendant Effectively Invoke His Right to Remain Silent?* . . . . 39

VI.   *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . 42

# I. INTRODUCTION

On the 10th day of November 2014, this matter came on for hearing on the Motion to Suppress (docket number 27) filed by the Defendant on October 14, 2014. The Government was represented by Assistant United States Attorneys Peter E. Deegan, Jr. and Anthony Morfitt. Defendant Jonathan Curtis Youngbear appeared in person and was represented by his attorneys, Diane Z. Helphrey and Timothy S. Ross-Boon.

# II. PROCEDURAL HISTORY

On April 23, 2014, Defendant Jonathan Curtis Youngbear was charged by Indictment with first degree murder in Indian country. Defendant appeared on April 25 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on June 23, 2014. Due to the complex nature of the case, however, trial was continued on Defendant's motion to February 23, 2015.

On October 14, 2014, Defendant timely filed the instant motion to suppress. The Government filed its resistance on October 31.

# III. RELEVANT FACTS

## A. 911 Call

At approximately 4:52 p.m. on February 24, 2014, the Tama County Sheriff's Office received a 911 call from Danielle Davenport, requesting an ambulance.[1] Davenport reported that "somebody's been stabbed." In response to questioning by the dispatcher, Davenport identified Severn Jefferson as the person who had been stabbed, and Jonathan Youngbear as the person who stabbed him. Davenport obtained the information from Joseph Youngbear, who had run from Jonathan Youngbear's house to Davenport's house next door. Joseph reported that Jefferson had been stabbed in the chest. Joseph also reported that Jonathan was still in the house. In subsequent calls, apparently made by the

---

[1] A recording of two 911 calls, together with other calls made on the non-emergency line, was introduced as Government's Exhibit 1.

dispatcher to Davenport's house on the non-emergency line, it was reported that Jonathan had a rifle in the house.

### B. Officers Respond to the Scene

Jason Dunagan, who at that time was assistant chief of the Meskwaki Nation Police Department, testified he was at the station and off-duty when the call came in. Also present at that time was Lieutenant Shimon. Dunagan and Shimon then proceeded to the scene in Shimon's vehicle. On the way to the scene, Dunagan was advised by dispatch that the suspect was in the house with the victim and had access to a rifle. Dunagan asked the Sheriff's Office to "send everybody," and several law enforcement agencies responded.

When the officers arrived on the scene, they "staged" some distance from the house until the nature of the threat could be determined. Daniel Quigley, a sergeant with the Toledo Police Department, was called to act as a "negotiator." Quigley previously worked as an officer at the Meskwaki Nation Police Department for two years and has specialized training regarding crisis and hostage negotiations. Quigley testified that as he approached the scene from the east, he was flagged down by neighbors, who advised him the subject inside the house had called his father and was coming out. As Quigley exited his patrol vehicle, he saw Defendant coming out of the house with his hands up.

Sergeant Quigley asked Defendant his name and he responded "Jonathan Youngbear." In response to a question, Defendant was he was not injured. When asked if anyone else was inside the house, Defendant said there was not. Quigley testified that there was dried blood on Defendant's hands and, as Quigley approached the house, he could see what appeared to be fresh bloody footprints in the snow. Assistant Chief Dunagan, who followed Quigley into the driveway, testified that when Defendant initially said there was no one in the house, Dunagan asked him again and Defendant said "two." Dunagan also testified that he saw bloody footprints on the porch where Defendant had exited the house.

## C. *Officers Enter the House*

Assistant Chief Dunagan, Sergeant Quigley, and two or three other officers then entered the house. According to Dunagan, when he "swept" the kitchen and living room, he could see a body at the far end of the hallway. A rifle was found in the kitchen/living room area, and Dunagan handed it to a deputy on the porch due to safety concerns. The officers then "cleared" the rest of the house, looking for other persons. There was a curtain in the hallway near the body, which appeared to Dunagan to be moving. Dunagan was concerned that there might be someone hiding behind it. No other persons were found in the house.

Assistant Chief Dunagan testified that the body was covered in blood and it appeared there was a cut on the left side of the neck. Ambulance personnel were called in, but found no vital signs. After they "pronounced the body," officers left the house. According to Dunagan, a search was not conducted at that time, but a long, bloody knife was seen in plain view on the kitchen floor. Officers did not disturb the knife before leaving the house.

## D. *Search Warrant*

Special Agent-in-Charge Darrell Simmons and Special Agent Matt George of the Iowa Division of Criminal Investigation ("DCI") testified they were called regarding the incident while receiving training in Des Moines.[2] Simmons, George, and other DCI personnel then drove to Tama County and met with officers at the Meskwaki Nation Police Department. Simmons testified that the trip took longer than expected because of an active

---

[2] Simmons testified he was called between 4:30 and 5:00 p.m. The Court notes parenthetically that this estimate of time would seem to be off, because the 911 call did not occur until 4:52 p.m. George testified he was called "in the evening hours." The "SWCAD call summary report" indicates dispatch was instructed to contact the DCI at approximately 5:36 p.m. *See* Government's Exhibit 5 at 2, and Defendant's Exhibit F.

snow storm. At approximately 8:10 p.m., after being briefed on the circumstances, Simmons and George interviewed Joseph Youngbear.

Joseph Youngbear, who was Severn Jefferson's half-brother, told Special Agent Simmons that he had been drinking and using drugs with Defendant and Severn Jefferson at Defendant's house.[3] They were drinking rum and smoking methamphetamine. According to Joseph, there was an argument, Defendant went to the kitchen, grabbed a knife, and then came up behind Jefferson, who was sitting on a couch, and stabbed him in the chest.

Special Agent Simmons then prepared an application for a search warrant and presented it to a state court judge.[4] Simmons took the search warrant back to the Meskwaki Nation Police Department and assigned other officers to execute the warrant. Simmons and Special Agent George then went to the Tama County Jail to interview Defendant.

### E. Defendant Transported to Tama County Sheriff's Office

Meanwhile, Defendant was transported to the Tama County Sheriff's Office at approximately 5:41 p.m. A log entry at 5:43 p.m. states that "subject is intoxicated and uncooperative."[5] Defendant arrived at the Sheriff's Office at 5:53 p.m.[6] When Defendant initially entered the booking room, his head was down and his hair was covering his eyes. Defendant appeared to be unsteady on his feet and was slurring his words. Initially, Defendant was loud, combative, and uncooperative. After a few minutes, however,

---

[3] It is my understanding that Joseph Youngbear and Defendant are cousins.

[4] The application and search warrant are attached to Defendant's motion to suppress as Exhibit A. At the time of hearing, Defendant also offered another "Exhibit A," consisting of the booking video.

[5] *See* Government's Exhibit 5 at 2, and Defendant's Exhibit F.

[6] The "booking video" was introduced as Defendant's Exhibit A.

Defendant calmed down and followed instructions to change into jail clothing. However, Defendant repeatedly asked "where is my brother?"

At 6:05 p.m., Defendant was instructed to sit back down, where he remained until he was taken to the interview room approximately 19 minutes later. Defendant fidgeted in the chair and repeatedly asked about his brother. When asked who his brother was, Defendant responded "Jared Michael Youngbear."[7] Defendant told sheriff's office personnel that his brother was a year younger and had recently joined the Army. At 6:09 p.m., Defendant asked "what happened to my brother" and said "he has nothing to do with this." Two minutes later, at 6:11 p.m., Defendant asked "can I write him a letter?" Defendant said that his brother was in basic training at Fort Benning, Georgia. Defendant was given a paper and pencil, but stopped writing after less than a minute.

At 6:16 p.m., Defendant was whimpering and forcibly blowing air out his mouth. He again asked for a paper and pencil and started writing again. Defendant asked the "initials" for Georgia and Tennessee and repeated that his brother was stationed at Fort Benning, Georgia. During this time, Defendant appeared calm and did not appear to be slurring his words. Defendant stopped writing after about five minutes.

After the booking process was completed, Defendant was placed in an interview room at the Tama County Sheriff's Office at 6:24 p.m. It was a small room with a table and three chairs. For nearly the next six hours, Defendant remained in the room, with only minimal contact with law enforcement officers. A video recording of the Defendant waiting in the room was introduced as Government's Exhibit 3.

When he was placed in the room, Defendant was asked if he wanted water, and was then given a cup of water. Defendant was also given a paper and pencil to "finish writing a letter to your brother." After breathing heavily for a minute or two, Defendant spent

---

[7] When he was later interviewed by Special Agent Simmons, Defendant also identified his brother as Jared.

approximately ten minutes reading and writing on the paper given to him, although it appears that he wrote very little. At 6:38 p.m., Defendant knocked on the table and a deputy came to the door and picked up the letter. Defendant then sat quietly for approximately four minutes, before laying his head down on the table at 6:42 p.m. Defendant did not stir again until 7:50 p.m. Defendant then got up, moved around for a few seconds, and sat back down, appearing to try to sleep. Defendant crossed his arms and tucked his hands inside the sleeves of his shirt, apparently because he was cold. Defendant then appears to fall back asleep.

At approximately 9:10 p.m., Defendant looks at his crotch and his pants appear to be wet. Apparently, Defendant either urinated in his clothing at that time, or discovered that he had urinated earlier. Defendant made no attempt to attract the attention of an officer, ask to use the bathroom, or report the wet clothing. At 10:11 p.m., Defendant knocked on the door and when a deputy answered, Defendant began crying. The deputy told Defendant to "sit down and relax" and that somebody would be coming to talk to him. The deputy left and Defendant stopped crying after about a minute. Defendant then placed his arms inside his shirt, apparently because he was cold. The video of Defendant alone in the interview room stops at 12:07 a.m. At that time, Defendant had been in the room for 5 hours and 43 minutes.[8]

### F. *Defendant Interviewed*

At 12:15 a.m., Special Agent Simmons and Special Agent George entered the interview room.[9] Immediately upon entering the room, Simmons advised Defendant of his *Miranda* rights. Using a printed form, Simmons reviewed each of Defendant's rights,

---

[8] I have not reviewed the entire video recording, lasting nearly six hours. I watched the first 30 minutes, those additional times which were identified by Defendant's counsel as significant, and viewed random points throughout the recording.

[9] A video recording of the interview was introduced as Government's Exhibit 4, and a transcript of the interview was introduced as Government's Exhibit 6.

explained it to him, asked if he understood, and had him initial each right. Defendant notes that after he initialed paragraph 2, he started to initial paragraph 3 and it was necessary for Simmons to tell him to "hang on a second" so he could finish reading the paragraph. After being advised of his rights, Defendant told Simmons that he understood his rights and wished to talk with the agents. Defendant signed a written waiver of his *Miranda* rights at 12:19 a.m.[10]

Almost immediately after signing the written waiver, Defendant asked if he could have a long sleeve shirt or a blanket. Special Agent Simmons responded "absolutely," and one was provided to him. Simmons then asked Defendant to provide identification information. Defendant stated his name, date of birth, and address, but did not know his social security number. Defendant did not immediately recall his cell phone number, but indicated that he "just got it." Defendant told Simmons that he was not working and not going to school.

Special Agent Simmons then asked Defendant about his activities during the days leading up to the incident. Defendant said that he had used methamphetamine on Saturday and early on Sunday. When asked when he last slept, Defendant said his "guesstimation would be about like maybe 36 hours," but then indicated that "it's been like maybe three or four days since I've slept."[11] Defendant also said he went to the liquor store and bought a bottle of "Admiral Nelson." Joseph Youngbear came over late Saturday night and was there "pretty much the entire Sunday." Severn Jefferson also came over on Sunday. (The stabbing occurred in the late afternoon on Monday, February 24.)

Approximately 17 minutes into the interview, Special Agent Simmons asked "what else do you remember?" Defendant responded with a question: "I killed someone?"

---

[10] A copy of the statement of rights and acknowledgment and waiver were introduced as Government's Exhibit 7.

[11] Recorded Interview of Defendant (Government's Exhibit 6) at 10.

Simmons responded "what do you think" and Defendant said "yeah."[12] Simmons then asked for details regarding the events and Defendant made a number of incriminating statements. Among other things, Defendant states that after he "hit" the victim, he went next door to the home of his uncle, Ellsworth Youngbear. Ellsworth told Defendant that he was going to call the police and Defendant then went back to his own house. When he re-entered the house, he "freaked out" because "I just realized what I've done."[13] Defendant told Simmons that he tried to move the body down the hallway, but "he was too heavy for me to move around."[14]

Special Agent Simmons then asked a number of questions regarding what Defendant used to "hit him with" and the details regarding how he was hit. At times, Defendant stated that he did not remember the details, and initially told Simmons that he hit him with a hammer. However, when asked "could it have been something other than a hammer," Defendant answered "probably." Defendant then described a black-handled steak knife obtained from the kitchen table. Later, Defendant said he could have hit him either with a hammer or a knife, and then suggested that he may have hit him with a gun.

Special Agent Simmons then asked about the positioning of Defendant and Jefferson when the assault occurred.

> Simmons: Where is SEV when you hit him?
> Youngbear: He's in the living room with me.
> Simmons: Was he beside you, in front of you, where is he?
> Youngbear: I think he is in front of me.
> Simmons: 'K. Are you in the living room with them?
> Youngbear: Yeah.
> Simmons: So you hit him. Are you facing him?
> Youngbear: Um. . .

---

[12] *Id.* at 12-13.

[13] *Id.* at 15.

[14] *Id.* at 16.

|            |                                                                 |
|------------|-----------------------------------------------------------------|
| Simmons:   | Or do you not know?                                             |
| Youngbear: | Yeah I was facing him I think.                                  |
| Simmons:   | Could you have been beside him or behind him?                  |
| Youngbear: | I think I was behind him actually. Yeah I think I was behind him. |
| Simmons:   | So where is he at when you're behind him?                      |
| Youngbear: | Can I just say I did it?                                        |
| Simmons:   | Well, we're just trying to figure out some of the details. That's . . . that's what we need to know. |
| Youngbear: | I don't want to talk about this anymore.                        |
| Simmons:   | 'K, would you answer other questions that don't pertain to you hitting him? |
| Youngbear: | Yeah.                                                           |
| Simmons:   | You would, you would answer those questions?                    |
| Youngbear: | Mm hmm.                                                         |

Recorded Interview of Defendant (Government's Exhibit 6) at 20-21.

Special Agent Simmons then asked Defendant about gangs and drug usage. Defendant told Simmons that he and Joseph had used methamphetamine that day, but Jefferson did not use methamphetamine because "he recently got locked up and he went to rehab and got himself cleaned up."[15]

Approximately 42 minutes into the interview, Special Agent George began asking questions. George told Defendant that he "appreciate[d] you taking us through this" because "I know it's not easy."[16] Defendant then started crying. When asked how he felt when he saw what he had done, Defendant responded "fucking terrible" and started crying harder.[17] George then asked Defendant "what do you think should happen," and

---

[15] *Id.* at 22.

[16] *Id.* at 25.

[17] *Id.* at 26.

Defendant responded "honestly, I want to die."[18] The major portion of the questioning concluded at 1:02 a.m., approximately 47 minutes after it started.

At that point, Special Agent Simmons and Special Agent George executed the search warrant on Defendant's person. Simmons explained that they would collect a buccal swab from Defendant's mouth for a DNA sample, and he would be taken to the hospital for the collection of blood. When asked if he had any questions, Defendant said "how's Joe doing?"[19] When told that Joe "had a really tough time," Defendant began crying hard.

At 1:07 a.m., Defendant was asked to stand up and the agents learned, for the first time, that his pants were wet. Defendant asked for a pair of underwear and said "I think I pee'd myself."[20] Special Agent Simmons testified Defendant was later permitted to shower and was given fresh clothes.

At 1:17 a.m., while the paperwork was apparently being completed, Special Agent George told Defendant that he knew Defendant was "feeling a lot of pain right now, I can see it." George then told Defendant that "it's gonna take you and, you know, grace from somewhere from other than right here I'm sure right?"[21] George told Defendant that "it took a lot of courage to tell us what happened," and Defendant responded "I think I blocked out what happened."[22] George suggested that "there's some hope inside of you" and Defendant began breathing hard and became more emotional. George suggested that "you gotta figure out a way and how you can learn from it" and suggested that "first thing

---

[18] *Id.*

[19] *Id.* at 29.

[20] *Id.* at 31.

[21] *Id.* at 37.

[22] *Id.*

probably is to say you're sorry."[23] Defendant was very emotional, crying, and said "I'm very sorry." George then suggested that "in some way maybe Sev is . . . is listening in right now" and advised "you don't wanna keep all that pent up inside, you know?"[24] Defendant responded by saying "I just killed my little [unintelligible]."[25] This line of questioning ended at 1:21 a.m.

At approximately 1:28 a.m., Special Agent George again told Defendant "I mean would it be helpful to . . . to . . . apologize or anything or . . . to accept . . ." Defendant was crying hard and responded: "Jesus I'm so fuckin' sorry . . . Sev I'm fuckin' sorry. Jesus, I'm so fuckin' sorry."[26] Special Agent Simmons then asked two more questions regarding what Defendant used to "hit him with." Defendant initially said he did not know, but then stated "I'm pretty sure it was, I think it was a rifle, but I'm not too sure and I really don't want to think about it."[27] Defendant and the agents left the room at 1:30 a.m.

### G.  Blood Testing

Roman Karas, a forensic chemist employed with the Federal Bureau of Investigation crime laboratory, testified regarding the results of drug and alcohol testing performed on a blood sample taken from Defendant.[28] On June 26, 2014, Karas was provided with a blood sample taken from Defendant. Karas was told the blood was drawn "approximately

---

[23] *Id.* at 38.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 41.

[27] *Id.* at 42.

[28] Karas received a bachelor of science degree in biochemistry and psychology from Virginia Tech in 1995, and has worked as a forensic chemist for a substantial length of time.

four hours after the interview started," or about 4:15 a.m. on February 25, 2014. According to Karas, the concentration of ethanol in the blood was 0.037 g%, with a margin of error of 0.004%.[29] A blood specimen was also provided to the DCI criminalistics laboratory in Ankeny, Iowa.[30] On June 4, 2014, Robert Monserrate of the DCI laboratory reported that the blood specimen had an ethyl alcohol concentration of 0.043 g/100 mL, with a margin of error or 0.002 g/100 mL.[31]

At the Government's request, Mr. Karas extrapolated back in time to determine Defendant's approximate blood alcohol concentration when his interview with the DCI agents began. According to Karas, an average person eliminates alcohol at approximately .018 g%/hour, but the value can be as low as .01 g%/hour or as high as .025 g%/hour. Using the average value, Karas estimated that Defendant's blood alcohol concentration would have been .109 when the interview began, with a range from .077 to .137.[32] According to Karas, "there are some indicates that people that may have an American

[29] Karas' written report was introduced as Defendant's Exhibit D.

[30] I assume the blood sample provided to the DCI was drawn at the same time as the sample provided to the FBI.

[31] A copy of the DCI report was introduced as Defendant's Exhibit C.

[32] At the time of hearing, Defendant offered Defendant's Exhibit E, which Defendant's counsel described as "one page from the Tama County Jail informational sheet, monitoring the Defendant through the course of the time he was in the initial custody." Under the heading "Appear under infl drug/alcohol," the Exhibit shows "Y" (for "yes") and states ".128 @ 2035." Karas was asked questions regarding the reliability of preliminary breath tests (PBTs). Defendant did not offer any further testimony regarding Exhibit E, but apparently suggests that Defendant was tested with a PBT and had a blood alcohol concentration of .128 at 8:35 p.m. I do not know how to interpret this evidence, however, because it appears that Defendant was in the interview room from 6:24 p.m. until 1:30 a.m., and there is no evidence that he submitted to a PBT at approximately 8:35 p.m. *If* Defendant had a blood alcohol concentration (BAC) of .128 at 8:35 p.m., then his BAC at 12:15 a.m. (when the interview began) may be estimated at .061, with a range between .034 and .091. This is *lower* than that estimated by Karas.

Indian background may have the ability to process more alcohol than somebody not from that background."

Mr. Karas opined that depending on a person's drinking history, someone at the "legal limit" of .08 would be experiencing some effects of the alcohol, including emotional instability, talkativeness, overall depression, some motor control issues, decreased inhibitions, and some loss in their ability to perceive their surroundings. Karas testified, however, that one cannot just consider the blood alcohol level in determining the effect on a person, but must also look at other factors, including whether the person has an extensive drinking history.

Mr. Karas also tested for drugs. He found methamphetamine at a level of 33.6 ng/mL, with a margin of error of 8.4 ng/mL, and amphetamine at a level lower than the calibration curve, so it was listed as less than 25 ng/mL in his report. According to Karas, methamphetamine metabolizes into amphetamine. Karas testified that it was possible that the amphetamine found in the blood sample was a metabolized version of the methamphetamine. It's also possible that Defendant used two different drugs. According to Karas, "it's not at all unusual to find methamphetamine with a lower amount of amphetamine." Both the methamphetamine and metabolized amphetamine are capable of having an effect on a person's functions.

Mr. Karas testified that the methamphetamine found in the blood was "consistent with therapeutic levels." Apparently, methamphetamine is available as a prescription, such as under the trade name Adderall, and used to treat ADHD. According to Karas, "for those individuals that are taking Adderall as a prescription, this level [of methamphetamine in the blood] would be consistent with what's considered therapeutic amounts." Karas was unable to determine the level of methamphetamine or amphetamine in Defendant's blood when the interview began four hours prior to the blood being drawn. Unlike ethanol, which is eliminated from the blood on a linear path, methamphetamine is

eliminated on a curve. Because Karas did not know when Defendant had last ingested methamphetamine, it was not possible for him to determine where on the curve Defendant may have been when the blood was drawn. It could be expected that the level of methamphetamine was higher four hours earlier, but Karas would not speculate on whether it would have been slightly higher or substantially higher.

Mr. Karas also found a metabolite of THC — carboxy $\Delta$-$^9$ THC — which was "inactive" and therefore was "no longer having an effect on the individual." Karas opined that "based on just the Carboxy THC, there is no evidence that the cannabis was having any effect on the person who provided the blood sample."

## IV. ISSUES PRESENTED

Defendant raises five issues in his motion to suppress. First, Defendant claims that the warrantless entry into his house on February 24, 2014 violated the Fourth Amendment. Second, Defendant argues that the search warrant subsequently obtained by law enforcement was invalid because it was based on "tainted evidence" obtained during the earlier warrantless entry. Third, Defendant asserts he did not validly waive his Constitutional rights following a *Miranda* warning. Fourth, Defendant argues that statements given by him to law enforcement were involuntary under the totality of the circumstances. Fifth, Defendant claims his Fifth Amendment rights were violated when officers continued to interrogate him after he invoked his right to remain silent.

## V. DISCUSSION

### A. Did the Warrantless Entry Violate the Constitution?

Defendant first argues that law enforcement violated the Fourth Amendment when they entered his residence after he had already been taken into custody. The United States Supreme Court has said that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).

> [T]he Fourth Amendment has drawn a firm line at the entrance
> to the house. Absent exigent circumstances, that threshold
> may not reasonably be crossed without a warrant.

*Payton*, 445 U.S. at 590 (cited with approval in *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002)).

Defendant asserts that when officers entered the residence, "the only information available to the officers consisted of the statements of Joseph Youngbear, as reported by his aunt, Danielle Davenport."[33] Defendant notes that law enforcement apparently made no attempt to speak to Joseph prior to entering the house, nor did they investigate Joseph's "background." Defendant argues that "[t]he uncorroborated information was insufficient to establish probable cause to enter the residence, and did not establish exigent circumstances to justify the warrantless entry into the residence."[34]

It is a basic principle of Fourth Amendment law that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, _____ U.S. _____, 131 S. Ct. 1849, 1856 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). However, because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" the presumption may be overcome in some circumstances. *Id.* That is, "the warrant requirement is subject to certain reasonable exceptions." *Id.* The exceptions are "jealously and carefully drawn," however, and the government has the burden of showing that "the exigencies of the situation made that course imperative." *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971).

Accordingly, it is necessary to determine whether there was probable cause to enter the house and, if so, whether exigent circumstances obviated the need for a warrant. "Probable cause exists when, 'given the totality of the circumstances, a reasonable person

---

[33] Defendant's Brief (docket number 27-1) at 5.

[34] *Id.* at 6.

could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place.'" *United States v. Poe*, 462 F.3d 998, 999-1000 (8th Cir. 2006) (quoting *Kleinholz v. United States*, 339 F.3d 674, 676 (8th Cir. 2003)). Here, law enforcement received two 911 calls reporting a stabbing at the residence. One of the calls provided details regarding the assault; specifically, that Jonathan Youngbear (the defendant) had stabbed Severn Jefferson. As officers approached the residence, Defendant came out with dried blood on his hands and leaving bloody footprints. A reasonable person could believe that a crime had been committed and there was "a fair probability" that evidence of the crime could be found inside the house. Accordingly, there was probable cause to search the residence.

It is not enough, however, for officers to have probable cause to believe that evidence of a crime could be found inside the house. Absent exigent circumstances, the Fourth Amendment would require the officers to obtain a search warrant for the premises. *Payton*, 445 U.S. at 590. Accordingly, the Government must show that a recognized exception to the search warrant requirement authorized the officers' warrantless entry. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984) (placing the burden on the government to overcome the presumption of unreasonableness that attaches to all warrantless home entries).

An exception to the warrant requirement applies when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *King*, 131 S. Ct. at 1856 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). One such exigent circumstance is the "emergency aid" exception, which permits officers to enter a home without a warrant "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (quoting *Brigham City*, 547 U.S. at 403). *See also Poe*, 462 F.3d at 1000 ("A legitimate concern for officer safety or the safety of others may constitute an

exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm.").

Turning to the facts in the instant action, law enforcement received two 911 calls, advising them that a stabbing victim could be found in the subject residence. One of the calls came from Danielle Davenport, who received the information from Joseph Youngbear, who allegedly witnessed the assault. The second 911 call came from Ellsworth Youngbear. At that time, law enforcement did not know the source of Ellsworth's information, but later learned that Defendant had gone to Ellsworth's home next door before police arrived.

Defendant claims that when officers entered the house, "the only information available" was Joseph Youngbear's "uncorroborated" story.[35] Defendant's argument that probable cause and exigent circumstances are lacking is based on a misstatement of the facts. Even if the Court disregards the second 911 call from Ellsworth Youngbear, it cannot be said that the information provided by Joseph Youngbear (via Danielle Davenport) was "uncorroborated." Sergeant Quigley, who first encountered Defendant when he exited the residence, testified that there was dried blood on Defendant's hands. Both Quigley and Assistant Chief Dunagan testified that there were fresh bloody footprints in the snow and on the porch. These facts corroborated Joseph's information that Defendant had stabbed Severn Jefferson, and a reasonable officer could infer that the stabbing victim was still inside the house.

The Eighth Circuit Court of Appeals has held repeatedly that immediate police action is justified "without obtaining a warrant if lives are threatened. . . ." *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (quoting *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996)). "Under the exigent-circumstances exception, police may enter property without a warrant if they could reasonably believe that a person is in

---

[35] *Id.* at 5-6.

need of immediate assistance." *United States Chipps*, 410 F.3d 438, 442 (8th Cir. 2005). In *United States v. Janis*, 387 F.3d 682 (8th Cir. 2004), an officer observed a trail of blood leading to the door of the house. The Court concluded that "the home entry could be justified for the officers to determine whether anyone else was injured or in danger, as the officers followed the trail of blood into the house and into the bedroom where the officers then discovered the guns in plain view." *Id.* at 688. *Compare Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (finding that exigent circumstances were lacking when there was no evidence of "risk of danger to the police or to other persons inside or outside the dwelling"). Clearly, exigent circumstances authorized the warrantless entry.

Officers had information from a 911 call that Defendant had stabbed Severn Jefferson. That information was corroborated when Defendant exited the house with blood on his hands and leaving bloody footprints. Under these circumstances, the "emergency aid" exception allowed the officers to enter the house to render emergency assistance to a possible victim. "[W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." *King*, 131 S. Ct. at 1858. It is *not* reasonable to require law enforcement to obtain a search warrant to enter a house when they can reasonably infer that a victim of a violent crime may be inside and in need of assistance. Indeed, under these circumstances, officers would presumably be derelict in their duty if they failed to render prompt assistance.

Defendant next argues that "even if the court finds that probable cause and exigent circumstances existed to justify a warrantless entry into defendant's residence, the scope and intensity of that intrusion exceeded the permissible scope of an entry designed only to secure the premises until a search warrant arrived."[36] Defendant asserts the police "conducted a lengthy search of the premises, moving objects of potential evidence, and

---

[36] *Id.* at 6.

lingering on the premises when there was no law enforcement need to do so."[37] It is true that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)). However, Defendant's assertions here are not supported by the record.

Assistant Chief Dunagan testified that when officers entered the house, they conducted a protective sweep of the residence, looking for other persons or victims. According to Dunagan, after it was established that there were no other persons in the house (except Jefferson) and medical personnel pronounced the victim dead, officers then left the premises until a search warrant could be obtained. It is clear that officers may conduct a protective sweep if the circumstances "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Cisneros-Gutierrez*, 598 F.3d at 1006. Here, officers had been called to the scene of a violent crime. When Defendant surrendered himself outside the house, he initially said there was no one inside, but then told Dunagan that there were two persons in the house. Officers also had information that there may be firearms in the house. Under these circumstances, a reasonable officer could conclude that it was necessary to conduct a protective sweep immediately upon entering the premises. Defendant's reliance on *Segura v. United States*, 468 U.S. 796 (1984), is misplaced. There, officers conducted an initial security check and then remained in the premises for 19 hours while a search warrant was obtained.

In summary, I believe there was probable cause and exigent circumstances to justify the officers' warrantless entry into Defendant's house. Furthermore, the protective sweep

---

[37] *Id.* at 6-7.

conducted by officers upon entering the house did not exceed the scope permitted under the circumstances. Therefore, I find no constitutional violation.[38]

## B. Is the Search Warrant Invalid?

Defendant next argues that because the search warrant application and supporting affidavit "is based almost exclusively on evidence obtained from the illegal entry onto the premises," evidence obtained pursuant to the search warrant is "fruit of the poisonous tree" and must be excluded.[39] The Government responds with four arguments: First, the warrantless entry was *not* unlawful and, therefore, observations inside the house were properly included in the search warrant application; second, even if information obtained during the warrantless entry was excluded, the search warrant application would nonetheless support a finding of probable cause; third, the officers acted in good faith reliance on the search warrant and, therefore, the exclusionary rule is inapplicable; and fourth, evidence found inside the house falls within the "inevitable discovery" doctrine.

As set forth above, I believe the warrantless entry into Defendant's house was supported by probable cause and exigent circumstances. If the district court agrees, then the Court need go no further. That is, Defendant apparently concedes, as he must, that the allegations set forth in the search warrant application support a finding of probable cause. If facts learned inside the house during the warrantless entry are properly included in the warrant application, then the search warrant is supported by probable cause and

---

[38] The Government argues alternatively that the officers' entry into the house was justified by their "community caretaking" function. "[T]he standard used when determining whether an officer may enter as a community caretaker is a less exacting standard than probable cause." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (citing *Mincey*, 437 U.S. at 392-93, and *Maryland v. Buie*, 494 U.S. 325, 336-37 (1990)). Because the officers' warrantless entry into the house was supported by probable cause and exigent circumstances, however, I believe it is unnecessary to discuss the Government's alternative argument.

[39] Defendant's Brief (docket number 27-1) at 7.

Defendant's second argument fails. If the court believes that the warrantless entry was unlawful, then it must consider the Government's alternative arguments.

The Government argues that even if information obtained during the initial entry into the house is excluded, the application nonetheless supports a finding of probable cause. In his application for search warrant, Special Agent Simmons describes the facts in ten sentences:

1. This afternoon at approximately, 4:52 PM, the Tama County Communications Center received a 911 call reference a stabbing at 1695 340th Street Tama, Iowa Which is located on the Meskwaki Nation Settlement.

2. The Meskwaki Police Department, the Tama County Sheriff's Office, and the Toledo Police Department responded to the emergency call.

3. Upon arrival, officers found Severn Daniel Jefferson unresponsive in the doorway of the southeast bedroom.

4. Officers observed blood pooling from apparent stab wounds to Jefferson's chest.

5. A bloody knife was located inside the residence is suspected to be the weapon used in the assault.

6. Officers at the scene located bloody foot impressions in the snow leaving the scene.

7. The Tama County Medical Examiner Investigator checked Jefferson's vitals and did find any and pronounced Jefferson deceased.

8. Witnesses identified Jonathan Youngbear as being the assailant and Youngbear used a knife during the assault.

9. Witness advised Law Enforcement that Youngbear stabbed Jefferson in the chest.

10. Witnesses observed Youngbear leave the scene prior to law enforcements arrival.

Application for Search Warrant (docket number 27-2 at 3) (numbering added by the Court for clarity).

Defendant argues, however, that the application is based "almost exclusively" on evidence obtained from inside the house. Defendant asserts that if evidence obtained

during the entry into the house is removed, then the affidavit is limited to the first two sentences.[40] I believe that substantially overstates Defendant's argument. It would appear that the statements found in sentences 3, 4, 5, and 7 are based on information obtained by authorities after entering the house. If those statements are omitted, the judicial officer issuing the warrant was told (1) officers responded to a reported stabbing, (2) upon arriving at the scene, officers located bloody foot impressions in the snow, (3) witnesses identified Jonathan Youngbear as using a knife during an assault, (4) a witness told law enforcement that Youngbear stabbed Jefferson in the chest, and (5) witnesses observed Youngbear "leave the scene" prior to law enforcement's arrival.

It should be recalled that it is only necessary that the judicial officer find that "there is a fair probability" that evidence of a crime could be found inside the house. *Poe*, 462 F.3d at 999-1000. *See also United States v. Dukes*, 758 F.3d 932, 936 (8th Cir. 2014) (When determining the existence of probable cause, "[t]he issuing judge should review the affidavit with a 'common sense approach and not in a hypertechnical fashion.'") (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)). "It is well established that a judge may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." *Id.* at 938 (quoting *United States v. Vega*, 676 F.3d 708, 717 (8th Cir. 2012)). While Special Agent Simmons' application can hardly be held up as a model of good draftsmanship, it nonetheless establishes probable cause to search the residence — even if facts learned inside the residence during the warrantless entry are excluded.[41]

---

[40] *Id.* at 8.

[41] Defendant argues that prior to entering the house, the police lacked probable cause to obtain a search warrant. It necessarily follows — according to Defendant — that police lacked probable cause and exigent circumstances to make a warrantless entry into the house. It is unclear what course of action Defendant believes was available to police.

(continued...)

The Government also argues in its resistance that even *if* the search warrant is otherwise invalid, evidence obtained during the search is not subject to the exclusionary rule, because the officers acted in good faith. The Constitution does not expressly prohibit the introduction of evidence obtained in violation of the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 906 (1984). Rather, the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The Court noted in *Leon* that it "frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Id.* at 918. After reviewing the purposes of the exclusionary rule, the Court concluded that "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" will not be suppressed. *Id.* at 922. An officer's reliance on a search warrant is not "objectively reasonable," however, if one of four circumstances is present:

> The Supreme Court has identified four circumstances in which an officer's reliance on a search warrant would be objectively unreasonable: (1) when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that the executing officer could not reasonably presume the warrant to be valid.

---

[41](...continued)

The Constitution does not require officers to stand idly by when they reasonably believe a stabbing victim may be in need of immediate medical assistance.

*United States v. Grant*, 490 F.3d 627, 632-33 (8th Cir. 2007) (citing *Leon*, 468 U.S. at 923).

Defendant did not file a reply to the Government's resistance, nor did Defendant's counsel respond to the Government's *Leon* argument at the time of hearing. Accordingly, the Court is left to speculate regarding Defendant's argument as to why the good-faith exception to the exclusionary rule found in *Leon* is inapplicable here. It seems clear that the first, second, and fourth circumstances described in *Grant* have no application. That is, Defendant does not assert that the search warrant application contains any false statements, that the issuing judge "wholly abandoned his judicial role," or that there are any "facial deficiencies" in the warrant. Furthermore, Defendant concedes that the search warrant application — on its face — is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Therefore, even if the search warrant is otherwise invalid, I believe the exclusionary rule is inapplicable due to the good-faith exception found in *Leon*.

Finally, the Government argues that evidence inside the house is not subject to exclusion at trial due to the "inevitable discovery" doctrine. While Defendant did not file a reply to the Government's resistance, he anticipated the argument in his initial brief and argued that the evidence is not saved by the "independent source" doctrine. The independent source doctrine is "closely related to the inevitable discovery doctrine." *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). *See also Murray v. United States*, 487 U.S. 533, 539 (1988) ("The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine.").

In *Swope*, the Court "examine[d] the independent source exception to the exclusionary rule in the context of a tainted search warrant." 542 F.3d at 613. The Court first noted that the exclusionary rule "reaches not only primary evidence obtained as a

direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *Id.* (quoting *Segura*, 468 U.S. at 804). The Court further noted, however, that the exclusionary rule is inapplicable when the government shows that the evidence was acquired through a source independent of the taint. Specifically, the Court held that a search warrant obtained after an illegal search may be an "independent source" if two questions are answered in the affirmative: "first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." *Id.* at 614 (citing *Murray*, 487 U.S. at 542).

I believe that both of the questions posed in *Swope* may be answered "yes" in this case. The first prong under *Murray* is "whether the police would have applied for the warrant had they not made the prior illegal observations." *Swope*, 542 F.3d at 615. Clearly, the police would have sought a search warrant in this case even if they had not made the earlier allegedly unlawful entry. Police had information that Jonathan Youngbear stabbed Severn Jefferson. Officers observed Youngbear come out of the house with blood on his hands and leaving bloody footprints. Even if police had not entered the house and found Jefferson's body, it is inconceivable that they would have walked away from the scene without seeking a search warrant.

The second question posed by *Swope* and *Murray* may also be answered "yes." The second prong requires a determination of whether the untainted portions of the search warrant application are nevertheless sufficient to support a finding of probable cause. *Swope*, 542 F.3d at 616. As discussed in more detail above, even if information obtained during the initial entry was redacted from the search warrant application, it would nonetheless support a finding of probable cause. "Both circumstantial evidence and inferences may support probable cause." *Id.* "The existence of probable cause depends

on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Dukes*, 758 F.3d at 936 (quoting *Solomon*, 432 F.3d at 827). When statements regarding observations made inside the house are redacted from the search warrant application, the judicial officer was told that law enforcement responded to a reported stabbing, located bloody foot impressions in the snow, was told that Jonathan Youngbear had stabbed Severn Jefferson in the chest with a knife, and observed Youngbear "leave the scene." As set forth above, I believe that a reviewing judge employing a "common sense approach and not in a hypertechnical fashion," and drawing reasonable inferences from the totality of the circumstances, could find that there was a "fair probability" that evidence of a crime would be found inside the house. *Dukes*, 758 F.3d at 936.[42]

---

[42] I believe it is unnecessary to address the closely-related doctrine of inevitable discovery. The inevitable discovery exception to the exclusionary rule applies when the government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012). Here, I believe the first prong is clearly met. That is, the evidence inside the house would have been discovered during the execution of a valid search warrant, even if officers had not initially entered the house. Regarding the second prong, it is unclear what "alternative line of investigation" is being urged by the Government in this case. In *McManaman*, officers were looking for a murder suspect when they happened upon a person in possession of drugs. Here, law enforcement was investigating the alleged stabbing. In his concurring opinion in *United States v. Thomas*, 524 F.3d 855 (8th Cir. 2008), Judge Colloton questions the Eighth Circuit's formulation of the second prong, arguing that the Supreme Court in *Nix v. Williams*, 467 U.S. 431 (1984), where the Court first adopted the inevitable discovery doctrine, does not require a "substantial, alternative line of investigation." Judge Colloton suggested that the Court "should align ourselves with the majority of circuits and abandon this unwarranted requirement." *Id.* at 862. In any event, I don't believe the district court needs to resolve that issue here.

In summary, I believe the search warrant was valid. First, the warrantless entry was lawful and observations inside the house were properly included in the search warrant application. Second, even if information obtained during the warrantless entry was excluded from the search warrant application, it nonetheless supported a finding of probable cause to search the house. Third, even if the search warrant were somehow invalid, the officers acted in objectively reasonable reliance on the warrant and, therefore, the *Leon* exception to the exclusionary rule applies. Finally, the independent source doctrine would permit the introduction of evidence found within the house. Accordingly, Defendant's second argument fails.

### C. Did Defendant Validly Waive His Miranda Rights?

It is undisputed that Defendant was advised of his *Miranda* rights and waived those rights. Defendant argues, however, that "the waiver of *Miranda* was not made voluntarily or knowingly and intelligently."[43] Conversely, the Government argues that Defendant "made a voluntary, knowing, and intelligent waiver of his *Miranda* rights."[44]

Immediately upon entering the interview room, Special Agent Simmons advised Defendant of his *Miranda* rights. Preliminarily, Simmons told Defendant that "I need to give you your *Miranda* rights" and asked "do you know what those are?" Defendant responded "kind of." Simmons then ascertained that Defendant is a high school graduate and can read and write the English language.

Special Agent Simmons then read Defendant his rights from a standard form used by the Iowa Division of Criminal Investigation. After reading each paragraph, Simmons explained what it meant and asked Defendant if he understood. Defendant acknowledged understanding and placed his initials by each paragraph. In arguing that his waiver was not knowing and intelligent, Defendant seizes on the fact that he started to initial

---

[43] Motion to Suppress (docket number 27) at 3, ¶ 8.

[44] Government's Resistance (docket number 39) at 13.

paragraph 3 before Simmons was able to read it. After explaining each of the rights, Simmons asked Defendant if, "having these rights in mind, do you wish to talk to us now?" Defendant responded "yeah" and signed the written waiver form.[45]

Defendant does not argue that the *Miranda* warning was defectively given, or that he did not waive his *Miranda* rights orally and in writing. Rather, Defendant argues the waiver of his *Miranda* rights was not valid. In *Moran v. Burbine*, 475 U.S. 412 (1986), the Court succinctly described the law regarding a defendant's waiver of his *Miranda* rights:

> *Miranda* holds that "the defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

475 U.S. at 421 (internal citations omitted).

### 1.   *Voluntary*

First, the Court must consider whether Defendant's waiver was voluntary in the sense that it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. In determining whether a waiver was voluntary, "a court looks at the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir.

---

[45] *See* Transcript of Recorded Interview (Government's Exhibit 6) at 4, and Statement of Rights and Acknowledgment and Waiver (Government's Exhibit 7).

2002). "A court must examine both 'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" *Id.* (quoting *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992)). The "ultimate question" of involuntariness is whether the individual's "'will has been overborne in his capacity for self-determination critically impaired,' such that his consent to search must have been involuntary." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (quoting *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006)).[46]

Prior to the interview, Defendant was left alone in the interview room for nearly six hours. The Government asserts that this period provided "a significant opportunity [for Defendant] to sober-up."[47] A videotape shows Defendant spent a significant amount of that time sleeping. While Defendant undoubtedly did "sober up" to some extent during that time, the evidence does not support a finding that the agents delayed specifically for that purpose. Rather, it was necessary for the agents to travel from Des Moines to Tama County, meet with Meskwaki Nation police officers to be briefed on the situation, seek a search warrant from a judicial officer, and interview an eye witness (Joseph Youngbear) before meeting with Defendant.

Defendant's principal argument appears to be that his mental impairment — caused by drugs, alcohol, and lack of sleep — rendered his waiver involuntary. "Intoxication and fatigue do not automatically render a confession involuntary, rather, the test is whether these impairments caused the defendant's will to be overborne." *United States v. Casal*, 915 F.3d 1225, 1229 (8th Cir. 1990). In *Casal*, the defendant "had recently used

---

[46] While *Syslo* and *McClinton* address the issue in a confession context, and *Vinton* addresses the issue in a consent to search context, rather than a waiver of rights context, the involuntariness argument is reviewed under the same standard — whether it involves waiver of a Fifth Amendment privilege, waiver of *Miranda* rights, or a consent to search. *United States v. Makes Room*, 49 F.3d 410, 414 (8th Cir. 1995).

[47] Government's Resistance (docket number 39) at 13.

methamphetamines and had not slept for five days." Because the defendant "did not act like an intoxicated person," however, the appellate court found that the district court did not err in finding the defendant capable of making a voluntary statement. *Id.*

Similarly, in *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008), the Court advised that "sleeplessness, alcohol use and drug use are relevant to our analysis, but 'intoxication and fatigue do not automatically render a confession involuntary.'" Gaddy had not slept the night before (the interview took place at approximately 7:00 a.m.) and had consumed alcohol and drugs several hours before he waived his rights. Nonetheless, Gaddy was "calm" and "cooperative" and the appellate court concluded that the district court did not err in finding that Gaddy's will was not overborne. *Id.* at 789.

The Eighth Circuit Court of Appeals has found on several occasions that a suspect's waiver, consent, or statement was voluntary, notwithstanding prior drug or alcohol use. *See, e.g.*, *United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008) (finding that nothing in the record indicated the defendant's "state of intoxication was so severe his will was overborne"); *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004) (consent to search was given voluntarily despite Contreras' methamphetamine and marijuana use, when he "appeared to be sober and in control of his faculties at the time he consented"); *United States v. Byrne*, 83 F.3d 984, 989 (8th Cir. 1996) (when the defendant was "coherent, composed and cooperative, although somewhat subdued, during the interrogation," the Court found that the accused's will was not overborne by her drug use); *United States v. Givens*, 712 F.2d 1298 (8th Cir. 1983).

Turning to the facts in this case, Defendant told the agents that he had been drinking and smoking methamphetamine during the days preceding his arrest. We know, however, that Defendant had not consumed any drugs or alcohol during the 7½ hours prior to the beginning of the interview. Based on a blood sample taken following the interview, a forensic chemist with the FBI testified that Defendant's blood alcohol concentration would

have been between .077 and .137 when the interview began. At that level, an individual would be experiencing some effects of alcohol; with the extent of the impairment depending, in part, on the person's drinking history. Defendant also tested positive for methamphetamine and amphetamine. According to the Government's expert, the drugs were at a "therapeutic level" when the blood sample was taken approximately four hours after the interview began, but the expert would not speculate regarding the levels when the interview took place. Defendant's blood sample also contained a metabolite of THC, but the expert opined that there is no evidence it was having any effect on Defendant.

Special Agents Simmons and George testified that Defendant was not showing any obvious signs of intoxication while he was being interviewed. The videotape of the interview supports that testimony. When being given his *Miranda* warning, Defendant was calm and responsive to Simmons' questions. Defendant's words do not appear to be slurred. The fact Defendant was somewhat over-eager in initialing paragraph 3 on the waiver form is not, in my view, significant. Nothing in the record suggests that Defendant's "will was overborne" when he orally and in writing waived his *Miranda* rights and agreed to speak with the investigators. Accordingly, I believe Defendant's waiver of his *Miranda* rights was voluntary.

### 2. *Knowing and Intelligent*

The Court must also determine whether Defendant's waiver was made "knowingly and intelligently." Specifically, the Court must determine whether Defendant waived his *Miranda* rights "with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. On this issue, Defendant asserts many of the same arguments urged on the issue of voluntariness. That is, Defendant argues that his mental impairment caused by drugs, alcohol, and lack of sleep prevented him from understanding his *Miranda* rights and the effect of a waiver.

Special Agent Simmons carefully reviewed the *Miranda* warning, reading each paragraph separately as Defendant read along. Defendant acknowledged that he is a high school graduate and is able to read and write the English language. Simmons also explained each paragraph and asked Defendant if he understood. Defendant initialed each paragraph, acknowledging his understanding. After all of the *Miranda* rights were explained, Defendant was asked if he "wish[ed] to talk to us now" and Defendant responded "yeah." Defendant then signed the written waiver form.

As discussed above, Defendant did not show any obvious signs of impairment when he told Special Agent Simmons that he understood each right and agreed to talk with investigators. While Defendant's blood alcohol concentration was apparently between .077 and .137 when Defendant acknowledged his understanding of the *Miranda* rights and signed the written waiver, the evidence does not support a finding that he lacked understanding of his rights when read to him by Simmons. Defendant had not had anything to drink for at least 7½ hours and, it appears, slept for a significant period of time during the interim. A blood sample taken four hours later showed drugs in his system at a "therapeutic level." I believe Defendant was aware of his *Miranda* rights and consciously decided to waive those rights.

In summary, Defendant's decision to waive his *Miranda* rights was not the result of any intimidation, coercion, or deception. There is no evidence that Defendant's will was overborne and, therefore, the waiver was voluntary. Similarly, while Defendant was under the influence of alcohol when he signed the written waiver form, the evidence supports a finding that he understood the nature of his *Miranda* rights and consciously decided to waive those rights and speak with investigators. Therefore, Defendant's third argument fails.

### D. Was Defendant's Statement to Investigators Voluntary?

Next, Defendant argues that even if he validly waived his *Miranda* rights, his statement was nonetheless involuntary. The Fifth Amendment prohibits the introduction of involuntary statements at trial. *United States v. Bordeaux*, 400 F.3d 548, 560 (8th Cir. 2005). "The Government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004).

"Consent is voluntary if it was 'the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008) (quoting *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000)). Stated otherwise, "[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724. There is no "talismanic definition of 'voluntariness,'" however, and the Court must determine whether the statement was voluntary by looking at the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224-25 (1973).[48]

The *Schneckloth* Court identified some of the factors to be considered in determining whether a statement is voluntary, including: "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the

---

[48] The issue in *Schneckloth* involved the voluntariness of a consent to search. The Court noted, however, that "[t]he most extensive judicial exposition of the meaning of 'voluntariness' has been developed in those cases in which the Court has had to determine the 'voluntariness' of a defendant's confession for purposes of the Fourteenth Amendment." Accordingly, the Court stated that it was "that body of case law to which we turn for initial guidance on the meaning of 'voluntariness' in the present context." 412 U.S. at 223-24.

questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* at 226 (internal citations omitted.) Similarly, in *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990), the Court described certain "suspects' characteristics" and "environmental" factors which may be considered in determining voluntariness. The suspects' characteristics may include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Chaidez*, 906 F.2d at 381.

Environmental factors which may be considered include:

> [W]hether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; [and] (5) was in a public or a secluded place.

*Chaidez*, 906 F.2d at 381. The factors set forth in *Chaidez* are not to be applied "mechanically," but rather serve as a "guide" to the Court's analysis. *Id.*

With these general principles in mind, the Court now turns to the facts in the instant action. At the time of these events, Defendant was 20 years old. Defendant told officers that he graduated from high school, and he is apparently of at least average intelligence. Defendant previously had some minor involvement with law enforcement. On December 9, 2011, Defendant was charged by the Meskwaki Nation Police Department with

possession of a controlled substance. On January 20, 2012, he was given a deferred judgment and placed on probation for one year.[49]

Defendant was clearly in custody when he was interviewed by investigators. While Defendant was not wearing handcuffs, he was detained in a small windowless room. Defendant waited more than six hours for investigators to arrive, but the interrogation lasted only about 45 minutes. Defendant was not threatened or physically intimidated by investigators during that time, nor is there evidence that he relied on any promises or misrepresentations by investigators. Neither Special Agent Simmons nor Special Agent George raised their voice when questioning Defendant. In fact, Defendant complains of "purported gesture[s] of compassion."

In arguing that his statements were involuntary, Defendant asserts that his capacity to resist pressure by the officers was affected by drugs and alcohol. Defendant also claims that his "fragile and intoxicated state" was further affected by being placed "in a holding cell with no food, no access to a bathroom, no bed or cot, and very little water for six hours."[50] While conceding investigators did not use any direct threats or intimidation, Defendant argues that "the subtle use of religious and spiritual references, the frequent complimenting of the defendant for having the courage to talk to them, the touching of the defendant on the arm in a purported gesture of compassion, and the use of leading questions, indicate a type of insidious manipulation by the officers designed to overcome the defendant's will."[51]

As discussed in greater detail above, Defendant told investigators that he had been drinking and using methamphetamine prior to the incident. Defendant had not consumed

---

[49] A printout of Defendant's prior criminal history was introduced as Government's Exhibit 8.

[50] Defendant's Brief (docket number 27-1) at 14.

[51] *Id.*

any alcohol for at least 7½ hours prior to the interrogation, however, and a blood sample taken 4 hours later showed drugs in his system at a "therapeutic level." Defendant's blood alcohol concentration at the beginning of the interview can be estimated at .109, more or less, but the effects of the alcohol at that time appear to be minimal. Special Agent Simmons carefully explained Defendant's *Miranda* rights, and Defendant acknowledged he understood his rights and signed a written waiver form. The video recording demonstrates that Defendant had no difficulty giving his name, age, date of birth, extent of education, and cell phone number, although he was unable to recall his social security number. While Defendant claimed to have some difficulty recalling the details of the assault, that would appear to be a function of his impairment at the time of the events, rather than his impairment when the interview was conducted. For the most part, Defendant was calm and cooperative during the interview, although he understandably became emotional on a few occasions.

In *United States v. Martin*, 28 F.3d 742 (8th Cir. 1994), the defendant argued that his confession was involuntary because his will was overborne by coercive police conduct and the effects of his drug use. While the defendant claimed that he had ingested methamphetamine shortly before his questioning, the interrogating officers testified that he did not appear to be under the influence of drugs. The magistrate judge compared the defendant's testimony at the suppression hearing with the defendant's taped statement and could "detect no difference at all in either his voice or his pattern of speech." *Id.* at 745. The Eighth Circuit concluded that the trial court had properly denied the defendant's motion to suppress. *See also United States v. Magness*, 69 F.2d 872, 874 (8th Cir. 1995) ("Without credible evidence of intoxication or any evidence of coercive police conduct, Magness's argument that his consent and confession were involuntary must fail.").

The Eighth Circuit Court of Appeals has repeatedly stated that "[w]e cannot find that a statement was involuntary unless it is established that law enforcement officials

engaged in coercive activity." *Bordeaux*, 400 F.3d at 560. *See also United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) ("Although mental condition is relevant to a suspect's susceptibility to police coercion, coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the Due Process Clause."); *United States v. Robinson*, 20 F.3d 320, 322 (8th Cir. 1994) ("Coercive police activity is a necessary predicate to finding that a confession is not voluntary in the constitutional sense.") (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

I do not find coercive activity by the police sufficient to overcome Defendant's free will, even considering his impaired mental state. The initial questioning by Special Agent Simmons was straightforward. The use of leading questions was limited and not designed to overbear Defendant's will. It was not until 42 minutes into the interview — just 5 minutes before the major portion of the questioning stopped — that Special Agent George emphasized that he "appreciated you taking us through this" because "I know it's not easy." Later, while the paperwork on the search warrant was being completed, George referred to "grace from somewhere from other than right here" and suggested that "in some way maybe Sev is listening in right now." In *United States v. Brave Heart*, 397 F.3d 1035 (8th Cir. 2005), the investigator "mentioned the 'burden' that Brave Heart must be carrying and stated that he 'needed to know the truth,' suggesting that doing so would make Brave Heart feel better." *Id.* at 1037. In granting the motion to suppress, the magistrate judge noted that the defendant could be heard sobbing on the tape and referred to the "emotionally charged nature of his confession." The Eighth Circuit Court of Appeals reversed, finding that the "tactics" used by officers to elicit confessions — including "playing on a suspect's emotions" or "conveying sympathy" — do not render a confession involuntary "unless 'the overall impact of the interrogation caused the

defendant's will to be overborne.'" *Id.* at 1041 (quoting *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993)).

After considering the totality of the circumstances, I do not believe that Defendant's statement was "extracted by use of physical and or psychological pressure that overbore a defendant's will." *Bordeaux*, 400 F.3d at 560. That is, Defendant's statement was not extracted "by threats, violence, or express or implied promises sufficient to overbear the Defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724. Accordingly, I believe the Government has met its burden of proof, and Defendant' fourth argument fails.

### E. Did Defendant Effectively Invoke His Right to Remain Silent?

Finally, Defendant asserts that law enforcement violated his Fifth Amendment right to remain silent by continuing to interrogate him after he unequivocally invoked silence. The Government concedes that if a suspect invokes his right to remain silent, that right must be "scrupulously honored" by interrogating officers. The Government argues, however, that Defendant's statement here was "qualified" and did not constitute an unequivocal assertion of his right to remain silent.

In *Miranda*, the Court instructed that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473-74. In *Michigan v. Mosley*, 423 U.S. 96 (1975), the Court addressed the language found in *Miranda* and noted that in certain circumstances "possible literal interpretations would lead to absurd and unintended results." *Id.* at 102. The *Mosley* Court concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104. If a suspect does not make "a clear, consistent expression of a desire to remain silent," however, then "there is no need to address the 'scrupulously honored' test of *Michigan v. Mosley*." *United States v.*

*Thompson*, 866 F.2d 268, 272 (8th Cir. 1989). *See also United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) ("Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*.").

Turning to the facts in the instant action, Special Agents Simmons and George entered the room where Defendant was being held at approximately 12:15 a.m. Simmons carefully reviewed Defendant's *Miranda* rights and Defendant agreed to speak with the investigators. After obtaining certain preliminary information, Simmons asked Defendant about his activities leading up to the incident. Defendant described his drinking and drug use. Defendant then described an argument which he had with the victim and started to provide details regarding the assault. At approximately 12:38 a.m., Defendant admitted killing "Sev." Defendant described going next door to his uncle's house, and then returning to his house and attempting to move Jefferson's body. Defendant told Simmons that he "freaked out" when he got back to his house because "I just realized what I've done." Simmons asked Defendant to draw a diagram of his house, but Defendant said "I don't want to do that."

Special Agent Simmons then asked for details regarding the assault. After Defendant described a black-handled steak knife which came from the kitchen table, Defendant was asked where he "hit" the victim. At approximately 12:48 a.m., Simmons asked Defendant where Sev was located when Defendant hit him.[52] At 12:50 a.m. — 35 minutes into the interview — Defendant said "I don't want to talk about this anymore."

Special Agent Simmons testified that he took Defendant's statement to mean that Defendant "didn't want to talk about the actual physical assault." To clarify, Simmons asked Defendant "Would you answer other questions that don't pertain to you hitting him?" Defendant responded "Yeah." To be sure, Simmons asked: "You would, you

---

[52] The exchange which followed is set forth on pages 9-10 above.

would answer those questions?" and Defendant responded affirmatively by saying: "Mm hmm." Simmons then continued to question Defendant regarding the argument, drug use, and the victim's character. Simmons did not return to the facts relating to the assault until 1:29 a.m. — during the last minute of the interrogation — when he asked "Do you know what you hit him with?" Defendant responded "I still don't." When asked if he was "still not sure," Defendant said "I'm pretty sure it was, I think it was a rifle, but I'm not too sure and I really don't want to think about it." The interrogation then ended.

I believe this issue is close. The question is whether Defendant's statement that "I don't want to talk about this anymore" is a clear and unequivocal expression of his right to remain silent. If so, then it was not "scrupulously honored" by Special Agent Simmons. On the other hand, if Defendant's reference to "this" was equivocal or qualified his statement that "I don't want to talk," then Simmons was entitled to clarify Defendant's statement and, when Defendant agreed to "answer other questions that don't pertain to you hitting him," continue to interrogate Defendant. *Davis v. United States*, 512 U.S. 452, 461 (1994) ("[W]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice to clarify whether or not he actually wants an attorney.").

Defendant waived his *Miranda* rights and voluntarily responded to questioning for approximately 35 minutes prior to stating that "I don't want to talk about this anymore." Immediately prior to Defendant's statement, Special Agent Simmons was pressing Defendant for details regarding the assault on Jefferson. Simmons asked Defendant where Jefferson was at when Defendant was behind him, and Defendant responded "Can I just say I did it?" When Simmons told Defendant that "we need to know" some of the details, Defendant said that he did not want to talk about "this" anymore. Considering the context of the statement and the totality of the circumstances, I believe Simmons was justified in clarifying Defendant's statement by asking whether he would answer other questions that

"don't pertain to you hitting him." Defendant twice told Simmons that he would answer those questions.

I reach a different conclusion, however, with respect to the questions posed by Special Agent Simmons during the last minute of the interrogation. At that point, Simmons returned to questions regarding Defendant's assault on Jefferson. Defendant had previously told Simmons that he didn't want to talk about the assault on Jefferson. When Simmons returned to that subject, he did not "scrupulously honor" Defendant's statement that he did not want to talk about "this" — meaning the assault on Jefferson.

In summary, I do not believe Defendant's statement made 35 minutes into the interview that he did not want to talk about "this" was "a clear, consistent expression of a desire to remain silent." *Thompson*, 866 F.2d at 272. Rather, it was a qualified statement. As made clear by Defendant's response to Special Agent Simmons' next question, it was an intent not to answer questions regarding the assault on Jefferson. After that time, Simmons scrupulously honored Defendant's refusal to answer questions regarding the assault, until the last minute of the interrogation. Until those last few questions, I do not believe there was a Fifth Amendment violation of Defendant's rights.

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 27) filed by the Defendant be **DENIED**, with one limited exception. I believe the questions asked by Special Agent Simmons during the last minute of the interrogation violated Defendant's statement that he did not want to talk about the assault on Jefferson. The Government should be prohibited from introducing the questions and answers elicited during the last minute of the interrogation.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded*

*that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on November 10, 2014.*

DATED this 25th day of November, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA